## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTOPHER LOWE**, on behalf of himself and all others similarly situated,<br><br>                  Plaintiff,<br>v.<br><br>**NBT BANK, N.A.,**<br><br>          Defendant. | Case No. <u>3:19-CV-1400</u>[MAD/ML] |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff Christopher Lowe, by counsel, and for his Class Action Complaint against Defendant NBT Bank, N.A. ("NBT"), he alleges as follows:

## INTRODUCTION

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, NBT Bank, N.A., arising from (a) the assessment and collection of overdraft fees ("OD Fees") or insufficient funds fees ("NSF Fees") on accounts that were not actually overdrawn; and (b) the assessment of more than one NSF Fee on the same item.

2.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in NBT's adhesion contracts and violate New York consumer protection law.

3.     In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that NBT will <u>only</u> charge OD Fees on transactions where there are insufficient funds to cover them.

4.     As happened to Plaintiff, however, NBT charges OD Fees even when there are sufficient funds to cover a debit card transaction, and also charges more than one NSF Fee on the same item when that item is reprocessed over and over again after initially being rejected for

insufficient funds.

5.      Plaintiff and other NBT customers have been injured by NBT's practices. On behalf of himself and the putative Classes, Plaintiff seeks damages, restitution and injunctive relief for NBT's breach of contract and deceptive practices.

## JURISDICTION

6.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1335(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one member of the proposed Classes is a citizen of a different state than Defendant.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

8.      Plaintiff Lowe is a natural person who is a citizen of New York and resides in Johnson City, New York. Plaintiff has a personal checking account with NBT, which is governed by NBT's "Your Consumer Deposit Account Agreement" ("Deposit Agreement"), Pricing Schedule for Products and Services ("Fee Schedule"), and Opt-In Form ("Overdraft Form").

9.      Defendant NBT is a bank with approximately $10 billion in assets. Defendant has more than 150 banking locations with offices in New York, Pennsylvania, Vermont, Massachusetts, New Hampshire, and Maine. Its headquarters are in Norwich, New York, making it a New York citizen.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

10. Plaintiff has a checking account with NBT.

11. NBT issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

12. Pursuant to its standard Deposit Agreement, NBT charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft or for items that are returned for insufficient funds.

## I. NBT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A. Overview of Claim

13. Mr. Lowe brings this cause of action challenging NBT's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

14. Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, NBT immediately reduces the consumer's checking account by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, the customer's account will always have sufficient funds available to cover the transactions because NBT has already sequestered the funds for payment.

15. However, NBT still assesses harsh $35 OD Fees on many of these transactions and mispresents its practices in its account documents.

16. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, NBT later assesses OD Fees on those same transactions

when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

17.    NBT maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, NBT sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

18.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

19.    Still, despite keeping those held funds off-limits for other transactions, NBT improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

20.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

21.     There is no justification for these practices, other than to maximize NBT's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But NBT is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But NBT was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on APPSN Transactions.

22.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in NBT's adhesion contracts—contracts that fundamentally misconstrue and mislead consumers about the true nature of NBT's processes and practices. These practices also exploit contractual discretion to gouge consumers.

23.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that NBT will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

24.     NBT is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

25.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from NBT. When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to NBT, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

26.     At this step, if the transaction is approved, NBT immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

27.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

28.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

29.     NBT (like all banks) decides whether to "pay" debit card transactions at

authorization. After that, NBT is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when NBT may choose either to pay the transaction or to decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

30.     Because NBT has already sequestered funds to cover the APPSN Transaction, there is no change—no impact whatsoever—to the available funds in an account when settlement occurs.

**C.  NBT's Account Contract**

31.     Plaintiff's NBT checking account is currently governed by NBT's standardized Deposit Agreement, Ex. A. Pursuant to the terms of the Deposit Agreement, account holders' contract with NBT is governed by the laws of the state of New York. Ex. A at 3.

32.     The Deposit Agreement and relevant contract documents covering OD Fees provide that NBT will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

33.     NBT's Overdraft Form, Ex. B, promises that overdraft determinations are made when a transaction is "authorized and paid":

> **An overdraft occurs when you do not have enough funds available in your account to cover a transaction**. We can cover your overdrafts in several different ways:
>
>     1. We have standard overdraft practices that come with your account.
>     2. We also offer overdraft protection plans, such as an Overdraft Line of

Credit and Autolink Transfer Service from another NBT Bank Checking or Savings account, which may be a less expensive way of covering your overdrafts. . . .

Standard Overdraft Practices
We do **authorize and pay overdrafts** for the following types of transactions:
• Checks and other transactions made using your checking account number
• Automatic bill payments

We do not **authorize and pay overdrafts** for the following types of transactions unless you ask us to (see below):
• ATM Transactions
• Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always **authorize and pay** any type of transaction. **If we do not authorize and pay an overdraft, your transaction will be declined.**

Ex. B (emphasis added).

34.     The Deposit Agreement states a transaction is "overdrawn" when an accountholder "authorizes" a transaction, and expressly promises that NBT places an "authorization hold" on an account at "authorization":

Overdrawing Your Account

**If you write a check or authorize a transfer or withdrawal from your account without sufficient money available to pay the check, transfer or withdrawal, you will be overdrawn.** We generally pay items in dollar amount order, high to low, up to the available balance in the account. This does not limit the bank's ability to pay or return items for other reasons. For example, we may determine whether to pay or not to pay checks in any order among checks presented on the same day. **If we pay a check, transfer or withdrawal order that exceeds the available balance in your account, you must repay us immediately.** If you do not repay us immediately, then you agree to pay all costs incurred by us, including attorney's fees, in any action taken by us to collect the amount of the overdraft. . . .

**A temporary debit authorization hold affects your account balance** - On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment

8

is made. **Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it.** You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. **You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.**

Ex. A at 2-3 (emphasis added).

35.     For debit card transactions, the bank decides whether to "authorize and pay" a debit card transaction at the moment of authorization. NBT represents to its customers that authorization and payment are one step, just like consumers using debit cards believe.

36.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are *always* funds to "cover" those transactions—yet NBT assesses OD Fees on them anyway.

37.     The above promises indicate that transactions are only overdraft transactions when they are *authorized* into a negative account balance. Of course, that is not true for APPSN Transactions.

38.     In fact, NBT actually authorizes transactions on positive funds, places a hold on those funds, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.

39.     NBT charges OD Fees even when sufficient funds exist to cover transactions that are "authorized and paid" into a positive balance. No express language in any document states that NBT may impose OD Fees on these APPSN Transactions.

40.     The account documents misconstrue NBT's true debit card processing and overdraft practices.

41.     First, and most fundamentally, NBT charges OD Fees on debit card transactions for which there are sufficient funds available to use to "cover" the transactions.

42.     NBT assesses OD Fees on APPSN Transactions that **do** have sufficient funds available to cover them throughout their lifecycle.

43.     NBT's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.

44.     Next, sufficient funds for APPSN Transactions are actually debited and held from the account immediately, consistent with standard industry practice.

45.     Because these withdrawals take place at authorization, the funds cannot be re-debited later. But that is what NBT does when its re-debits the account during a secret batching posting process.

46.     NBT's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

47.     At the time of settlement, however, an available balance *does not change at all* for APPSN Transactions previously authorized into good funds. As such, NBT cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

48.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, NBT does something new and unexpected by its customers during its nightly batch posting process. Specifically, NBT releases the hold placed on funds for the transaction for a split-second, putting money back into the account, and then re-debits the same transaction a second time.

49. This secret step allows NBT to charge OD Fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which NBT specifically set aside money to pay.

50. This discrepancy between NBT's actual practices and the contract causes accountholders to incur more OD Fees than they should.

51. In sum, there is a huge gap between NBT's practices as described in the account documents and NBT's practices in reality.

**D. Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

52. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with the immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

53. NBT was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

54. NBT knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

55. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About*

*Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), http://www.consumeraction.org/ helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

56.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited Nov. 12, 2019).

57.     This understanding is a large part of the reason that debit cards have risen in popularity. In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011, and with that increasing ubiquity, consumers have viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

58.     Not only have consumers increasingly switched from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

### E.  Plaintiff Lowe's Debit Card Transactions

59.     As an example, on October 26, 2018, Mr. Lowe was assessed an OD Fee in the amount of $35.00 for a debit card transaction in the amount of $2.31 that settled that day. However, that transaction was authorized and paid into a <u>positive</u> account balance prior to that day.

60.     Because NBT had previously sequestered the funds to cover that transaction at the

time of authorization, Plaintiff's account had sufficient funds to cover the transaction and should not have been assessed an OD Fee.

61.    The improper OD Fees charged by NBT were not "errors" by the bank but rather were intentional charges made by the bank as part of its standard processing of transactions.

62.    Plaintiff therefore had no duty to report the fees as "errors" because they were not "errors," but were systematic and intentional assessment of fees according to the NBT's standard practices.

## II.    NBT CHARGES MORE THAN ONE NSF FEE ON THE SAME ITEM AND CHARGES BOTH NSF FEES AND OD FEES ON THE SAME ITEM

63.    As alleged more fully herein, NBT's Account Documents allow it to charge a *single* $35 NSF Fee or a *single* $35 OD Fee when an item, including an electronic payment item, is returned for insufficient funds or paid into insufficient funds.

64.    NBT breaches its contract when it charges more than one $35 NSF Fee on the same item, since the contract explicitly states—and reasonable consumers understand—that the same item can only incur a single NSF or OD Fee.

65.    The Bank similarly breaches its contract when it charges both a $35 NSF Fee (or multiple NSF Fees) *and* a $35 OD Fee on the same item since the contract explicitly states—and reasonable consumers understand—that the same item cannot incur more than one fee, let alone both types of fees.

66.    This abusive practice is not universal in the financial services industry. Indeed, major banks like JP Morgan Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed. Instead,

Chase charges one NSF Fee even if an item is resubmitted for payment multiple times.[1]

67.     NBT's Deposit Agreement never discloses this practice and NBT's customers never agree to this practice. To the contrary, the Deposit Agreement promises that NBT will only charge a single NSF Fee or OD Fee on an item.

### A.   <u>Plaintiff Lowe's Experience</u>

68.     In support of his claims, Plaintiff Lowe offers an example of fees that should not have been assessed against his checking account. As alleged below, NBT: (a) reprocessed a declined item; (b) charged an additional NSF upon reprocessing; then (c) reprocessed the same item once again but this time paid it into overdraft, and (d) charged an OD Fee on the same item, for a total assessment of *$105 in fees on a single item.*

69.     On September 10, 2018, Plaintiff Lowe attempted a payment via check.

70.     NBT rejected payment of that item due to insufficient funds in Plaintiff's account and charged him a $35 NSF Fee for doing so. Plaintiff does not dispute this initial fee, as it is allowed by NBT's account documents.

71.     Unbeknownst to Plaintiff, and without his request to NBT to reprocess the item, however, two days later, on September 12, 2018, NBT processed the same item yet again, and charged Plaintiff another $35 NSF Fee.

72.     Then, again unbeknownst to Plaintiff and without his request to NBT to reprocess the item, one day later, on September 13, 2018, NBT processed the same item yet again, and this time NBT paid the item into insufficient funds and charged Plaintiff a $35 OD Fee.

73.     *In sum, NBT charged Plaintiff $105 in fees to process a single payment—a payment*

---

[1] As indicated by Chase's printed disclosures, an "item" maintains its integrity even if multiple processes are effected on it: "If we return the same item multiple times, we will only charge you one Returned Item Fee for that item within a 30-day period."

*NBT could have simply paid into overdraft in the first instance and for which NBT already charged*

*two NSF fees.*

74.     Plaintiff understood the payment to be a single item as is laid out in NBT's contract, capable at most of receiving a single NSF Fee (if NBT returned them) or a single OD Fee (if NBT paid them).

### B.   The Imposition of Multiple NSF Fees and OD Fees on a Single Transaction Violates NBT's Express Promises and Representations

75.     NBT's Account Documents repeatedly discuss OD and NSF Fees together and repeatedly state that the Bank will assess a single *$35 fee per item* that is returned due to insufficient funds or paid into insufficient funds.

76.     According to the Fee Schedule, Ex. C, at most a *single* fee will be assessed when an "item" is returned or paid into overdraft:

> Insufficient or Uncollected Funds (NSF) *per*
> *returned or paid item*                                $35.00
> (For consumer accounts only Limited to 5 per day,
> or $175.00)

Ex. C (emphasis added).

77.     The same check or electronic payment on an account cannot conceivably become a new item each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit the item.

78.     There is zero indication anywhere in the account documents that the same item is eligible to incur multiple NSF or OD Fees.

79.     Even if NBT reprocesses an instruction for payment, it is still the same item. The bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

80.     Moreover, by expressly linking OD Fees (for paid items) and NSF Fees (for returned items) in the Fee Schedule's disclosure, NBT bolsters account holders' reasonable assumption that only a single fee can be assessed on an item. For an item charged an OD Fee and paid into overdraft, there is no chance it can be subject to reprocessing and thus no chance it could be subject to a second or third fee, since it has already been paid. No reasonable contract reading could allow the *other* fee mentioned in the disclosure—the NSF Fee—to be treated differently and assessed two or three times on the same item.

81.     The disclosures described above never discuss a circumstance where NBT may assess multiple NSF or OD Fees for an item that was returned for insufficient funds and later reprocessed one or more times and returned again, and customers certainly never agree to this practice.

82.     In sum, NBT promises that one $35 NSF Fee or one $35 OD Fee will be assessed per item, and this must mean all iterations of the same instruction for payment. As such, NBT breached the contract when it charged more than one fee per item.

83.     Reasonable consumers understand any given authorization for payment to be one, singular item, as that term is used in NBT's Deposit Agreement.

84.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which the Bank will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does NBT indicate that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do NBT customers ever agree to such fees.

85.     Customers reasonably understand, based on the language of the Account

Documents, that the Bank's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF or OD Fees. In other words, it is always the same item.

86.     Banks like NBT that employ this abusive multiple fee practice plainly and clearly disclose it and require their account holders to agree to it—something Defendant here never did.

87.     For example, First Hawaiian Bank engages in the same abusive practices as Defendant, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/ en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_ RXP1.pdf (last accessed Nov. 12, 2019) (emphasis added).

88.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer and Small Business Online Access Agreement*, Klein Bank ¶ H, https://www.kleinbankonline.com/bridge/disclosures/ib/disclose.html (last visited Nov. 12, 2019) (emphasis added).

89.     NBT provides no such disclosure, and in so doing, deceives its accountholders.

**C.   <u>The Imposition of Multiple NSF Fees or OD Fees on a Single Item Breaches NBT's Duty of Good Faith and Fair Dealing</u>**

90.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

91.     Here—in the adhesion agreements NBT foisted on Plaintiff and its other customers—NBT has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

92.     NBT exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "item" in a way that directly leads to more NSF and OD Fees. Further, NBT abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Deposit Agreement. This is a breach of NBT's implied covenant to engage in fair dealing and act in good faith.

93.     NBT also abuses its discretion under the contract to engage in a reject-then-pay pattern of first rejecting—and charging one or more NSF fees on—an item and then, days later,

paying that same item and charging an OD Fee, despite the customer being in the same (insufficient funds) financial situation.

94.     By so acting to maximize fee assessments, NBT fails to exercise its power fairly and in good faith. Indeed, had NBT paid the item into overdraft on the first processing attempt (as it in fact chose to do on the third processing attempt) it would have charged Plaintiff a single OD Fee. Instead, NBT first rejected the item so that it could charge two NSF Fees; then, only upon the second resubmission, NBT paid the same item and charged Plaintiff an OD Fee. The extra step served no purpose except to increase NBT's fee revenue and was an abuse of the discretionary powers NBT granted to itself under the contract.

95.     It was bad faith and totally outside Plaintiff's reasonable expectations for NBT to use its discretion to assess two or three NSF or OD Fees for a single attempted payment.

96.     By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one NSF Fee or OD Fee on a single item, NBT breaches the reasonable expectations of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

## CLASS ALLEGATIONS

97.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

98.     The proposed Classes are defined as:

All persons who, during the applicable statute of limitations period through the date of class certification, were charged OD Fees on transactions that did not overdraw their checking accounts (the "APPSN Class");

All persons who, within the applicable statute of limitations period, were charged multiple NSF Fees for the same item in an NBT checking account (the "Multiple NSF Class").

All persons who, within the applicable statute of limitations period, were charged an NSF Fee and an OD Fee for the same item in an NBT checking account (the "NSF/OD Class").

99.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

100.    Excluded from the Classes are NBT, its parents, subsidiaries, affiliates, officers, and directors; any entity in which NBT has a controlling interest; all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

101.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the knowledge of NBT and can be ascertained only by resort to NBT's records.

102.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged OD Fees by NBT on transactions that did not actually overdraw his checking account and/or more than one NSF or OD Fee on the same item. The representative Plaintiff, like all members of the Classes, has been damaged by NBT's misconduct in that he has been charged OD and NSF Fees that violate the account contract. Furthermore, the factual basis of NBT's misconduct is common to all members of the Classes and represents a common thread of deceptive, unfair, and unconscionable conduct resulting in injury to all members of the Classes.

103.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members.

104.   Among the questions of law and fact common to the Classes are:

    a.    whether NBT imposed OD Fees on debit card transactions when those transactions did not overdraw accounts;

    b.    whether NBT imposed more than one NSF or OD Fee on the same item;

    c.    whether NBT violated the terms of its contract through its fee practices as alleged herein;

    d.    whether NBT violated its duty of good faith and fair dealing;

    e.    the proper method or methods by which to measure damages; and

    f.    the declaratory relief to which Class members are entitled.

105.   Plaintiff's claims are typical of the claims of other members of the Classes in that they arise out of the same wrongful fee policies and practices of NBT. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of the Classes.

106.   Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

107.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of NBT, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and NBT's misconduct will proceed without remedy.

108.   Even if members of the Classes could themselves afford such individual litigation,

the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Classes)

109. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

110. Plaintiff and NBT have contracted for bank account deposit, checking, ATM, and debit card services.

111. NBT breached promises included in the account documents as described herein when it charged OD Fees on APPSN transactions that did not overdraw checking accounts.

112. NBT breached promises included in the account documents as described herein when it charged more than one NSF or OD Fee on the same item.

113. Under New York law, good faith is an element of every contract pertaining to the assessment of overdraft fees. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the

performance of contracts.

114.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

115.    NBT has also breached the covenant of good faith and fair dealing in its Deposit Agreement with customers through its OD Fee and NSF Fee policies and practices as alleged herein.

116.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

117.    Plaintiff and members of the Classes have sustained damages as a result of NBT's breach of the contract.

118.    Plaintiff and members of the Classes have sustained damages as a result of NBT's breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Violations of New York General Business Law § 349, _et seq._**
**(On Behalf of Plaintiff and the Classes)**

119.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

120.    NBT's practice of charging OD Fees on APPSN transactions that did not overdraw checking accounts violates New York General Business Law § 349 ("NYGBL § 349").

121.    NBT's practice of charging multiple NSF or OD Fees on a single transaction also

violates NYGBL § 349.

122.    NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

123.    NBT is headquartered in New York and has more than 150 banking locations with offices in New York, Pennsylvania, Vermont, Massachusetts, New Hampshire, and Maine. Accordingly, NBT conducted business, trade or commerce in New York State.

124.    In the conduct of its business, trade, and commerce, and in furnishing services in New York State, NBT's actions were directed at consumers.

125.    In the conduct of its business, trade, and commerce, and in furnishing services in New York State, NBT engaged in deceptive, unfair, and unlawful trade, acts or practices, in violation of NYGBL § 349(a), including but not limited to the following:

      a.    NBT misrepresented material facts pertaining to the sale and/or furnishing of banking services to Plaintiff and the Classes by representing that it would charge OD Fees only on transactions that actually overdrew an account;

      b.    NBT misrepresented material facts pertaining to the sale and/or furnishing of banking services to Plaintiff and the Classes by representing that it would not charge more than one NSF or OD Fee for the same item;

      c.    NBT omitted, suppressed, and concealed the material fact that it would charge OD Fees on transactions that did not actually overdraw the account; and

      d.    NBT omitted, suppressed, and concealed the material fact that it would charge more than one NSF or OD Fee for the same item.

126.    NBT systematically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiff Lowe and members of the Classes.

127.    NBT willfully engaged in such acts and practices and knew that it violated NYGBL § 349 or showed reckless disregard for whether it violated NYGBL § 349.

128.    As a direct and proximate result of NBT's deceptive banking practices, members of the Classes suffered injury and/or damages, including the payment of deceptive OD and NSF Fees, as described herein, and the loss of the benefit of their respective bargains with NBT.

129.    The unfair and deceptive practices by NBT, as described herein, were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

130.    Further, NBT's conduct was substantially injurious to Plaintiff Lowe and members of the putative Classes in that they were forced to pay OD and NSF Fees they were told they would not incur.

131.    NBT's actions in engaging in the above-described unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Classes.

132.    Had Plaintiff Lowe and members of the Classes known they could be charged the above-described deceptive OD or NSF Fees, they would have attempted to avoid incurring such fees.

133.    As a result of NBT's violations of the NYGBL § 349, Plaintiff Lowe and members of the Classes have paid and will continue to pay improper OD and NSF Fees. Accordingly, Plaintiff and the Classes have suffered and will continue to suffer actual damages.

134.    Accordingly, Plaintiff Lowe and the members of the Classes are entitled to relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages,

statutory damages, injunctive relief, and/or attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.      Certification of this action as a class action and appointment of Plaintiff as Class Representative and Plaintiff's counsel as Class counsel;

b.      Restitution of all OD Fees paid to NBT by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

c.      Restitution of all NSF Fees paid to NBT by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

d.      Actual damages in an amount according to proof;

e.      Actual damages, statutory damages, and/or treble damages in accordance with New York law;

f.      Pre-judgment interest at the maximum rate permitted by applicable law;

g.      Costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

h.      Such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Dated: November 13, 2019          Respectfully submitted,

*/s/ James J. Bilsborrow*
James J. Bilsborrow (Bar Roll #519903)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, New York 10003
Telephone: (212) 558-5500
jbilsborrow@weitzlux.com

Jeffrey D. Kaliel (*pro hac vice* to be filed)
Sophia G. Gold (*pro hac vice* to be filed)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielplllc.com

Lynn A. Toops (*pro hac vice* to be filed)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-2593
ltoops@cohenandmalad.com

J. Gerard Stranch, IV (*pro hac vice* to be filed)
Martin F. Schubert (*pro hac vice* to be filed)
**BRANSTETTER, STRANCH
& JENNINGS, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
gerards@bsjfirm.com
martys@bsjfirm.com

Christopher D. Jennings (*pro hac vice* to be filed)
**THE JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com

***Counsel for Plaintiff and the Proposed Classes***